Pee Dee Elec. Membership Corp. v. King, 2018 NCBC 22.

STATE OF NORTH CAROLINA

ANSON COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 367

PEE DEE ELECTRIC
MEMBERSHIP CORPORATION,

        Plaintiff,

v.

BRYAN J. KING; ACCUKING, INC.,
f/k/a KING AEROSPACE AND
TECHNOLOGIES CORPORATION
f/k/a KING AEROTECH, INC.; and
TRITECH DIRECT CORPORATION,

        Defendants.

**ORDER AND OPINION ON
PLAINTIFF'S MOTION FOR
DEFAULT JUDGMENT**

1.    **THIS MATTER** is before the Court on Plaintiff Pee Dee Electric Membership Corporation's ("Pee Dee" or "Plaintiff") Motion for Default Judgment (the "Motion") in the above-captioned case.

2.    The Court, having considered the Motion, Plaintiff's brief in support of the Motion, the testimony of Plaintiff's witnesses at the February 28, 2018 hearing on the Motion, and other appropriate matters of record, **GRANTS in part and DENIES in part** Plaintiff's Motion as to AccuKing and TriTech, **ENTERS** default judgment for Plaintiff against AccuKing and TriTech, jointly and severally, and **AWARDS** damages to Plaintiff as set forth below.[1]

> *Smith & Christensen, LLP, by Aaron M. Christensen, for Plaintiff Pee Dee Electric Membership Corporation.*

---

[1] Plaintiff's Motion requests that Plaintiff's actual damages be trebled and that Plaintiff be awarded attorneys' fees in an amount to be shown at the hearing. At the February 28, 2018 hearing, however, Plaintiff abandoned its request for attorneys' fees, and the Court thus denies the Motion as to that request.

*Defendant Bryan J. King, Defendant AccuKing, Inc. f/k/a King Aerospace and Technologies Corporation f/k/a King Aerotech, Inc., and Defendant TriTech Direct Corporation did not appear.*

Bledsoe, Judge.

## I.

## PROCEDURAL BACKGROUND

3.     Plaintiff filed its Complaint on October 4, 2017 and served a copy of the Summons and Complaint on Defendants Bryan J. King ("King"), AccuKing, Inc. ("AccuKing"), and TriTech Direct Corporation ("TriTech") (collectively, "Defendants") by United States Certified Mail, return receipt requested, on October 18, 2017. Plaintiff made further attempts to communicate with Defendants in writing and by telephone, but Defendants did not respond.  Defendants did not file a responsive pleading or any other documents with the Court.

4.     On November 30, 2017, Plaintiff moved the Court for entry of default against each Defendant.  The Court entered default against each Defendant on December 1, 2017, pursuant to Rule 55(a).

5.     On December 18, 2017, Plaintiff moved for default judgment against all Defendants, jointly and severally, pursuant to Rule 55 of the North Carolina Rules of Civil Procedure.  Plaintiff requested judgment without a hearing as to liability and actual damages against any Defendant who failed to serve a written response in opposition to Plaintiff's Motion within thirty days of service of the Motion.  *See* N.C. R. Civ. P. 55(b)(2)(b)(1).

6. Plaintiff also requested a non-jury hearing on Plaintiff's Motion to prove that Plaintiff's actual injuries were proximately caused by Defendants' conduct for purposes of Plaintiff's claim for unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1. *See Decker v. Homes, Inc./Constr. Mgmt. & Fin. Grp.*, 187 N.C. App. 658, 666, 654 S.E.2d 495, 501 (2007) ("The entry of default established the liability of defendants under a theory of unfair and deceptive trade practices. However, in order to recover damages arising from an unfair and deceptive trade practices claim, a plaintiff must prove actual injury as a proximate result of the violation of N.C. Gen. Stat. § 75-1.1.").

7. Plaintiff served the Motion on December 18, 2017. Defendants did not respond to the Motion.

8. On February 6, 2018, King filed for bankruptcy under Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of North Carolina. Neither TriTech nor AccuKing has appeared in this case or filed for bankruptcy.

9. On February 28, 2018, the Court held an evidentiary hearing on the Motion, at which Plaintiff was represented by counsel. Plaintiff offered live witness testimony at the hearing. Defendants did not appear.

10. The Motion is now ripe for resolution.

## II.

## EFFECT OF DEFENDANT KING'S BANKRUPTCY

11.    "The initiation of . . . Chapter 7 . . . proceedings triggers an 'automatic stay'" in court proceedings under 11 U.S.C. § 362(a)(1). *Tidewater Fin. Co. v. Williams*, 498 F.3d 249, 252 (4th Cir. 2007); *see Kreisler v. Goldberg*, 478 F.3d 209, 213 (4th Cir. 2007). "Subsection (a)(1) is generally said to be available only to the debtor, not third party defendants or co-defendants." *Kreisler*, 478 F.3d at 213. Although "unusual circumstances" present exceptions to this general rule, the Fourth Circuit has expressly ruled that a debtor's ownership of a non-bankrupt entity does not merit extending the protections of the automatic stay to that non-bankrupt entity. *Id.* at 213–14 ("It is a fundamental precept of corporate law that each corporation is a separate legal entity with its own debts and assets, even when such corporation is wholly owned by another corporate entity. . . . Accordingly, had [the wholly-owned entity] wished to receive the protections afforded by § 362(a)(1), it must have filed for bankruptcy."); *see also Terry v. Yancey*, 344 F.2d 789, 790 (4th Cir. 1965) ("[W]here an individual creates a corporation as a means of carrying out his business purposes he may not ignore the existence of the corporation in order to avoid its disadvantages.").

12.    Further, the automatic stay will not apply to litigation against a non-bankrupt entity owned by the debtor merely because that litigation may result in the value of the debtor's ownership interest decreasing. *Kreisler*, 478 F.3d at 214–15 (concluding that the automatic stay did not extend to an entity owned by the debtor

when the proceedings against the owned entity "affected only the *value* of [the debtor's] interest," not the nature and extent of that interest). The property of the non-bankrupt entity is not the property of the debtor's estate. *Id.* at 214 (noting that an ownership interest in a legal entity does not give the owner a direct interest in the assets of the entity).

13. For the reasons discussed herein, the Court concludes that AccuKing and TriTech are liable to Plaintiff. Despite the fact that King may have an ownership interest in AccuKing or TriTech, because AccuKing and TriTech are separate legal entities from King, and because no facts indicate that AccuKing or TriTech are entitled to absolute indemnity from King, entry of default judgment against AccuKing and TriTech is not precluded by King's bankruptcy. *Id.* at 213–15; *see Nat'l Elec. Benefit Fund v. 3W Elec. LLC*, 2017 U.S. Dist. LEXIS 40992, at *7–8 (D. Md. Mar. 20, 2017) ("Courts, however, have not recognized membership in or ownership of an LLC to constitute . . . an 'unusual situation.'"); *Ojiegbe v. Walter*, 512 B.R. 513, 521–22 (Bankr. D. Md. 2014) (holding that an individual debtor's sole ownership of an LLC did not merit extending the automatic stay to cover the LLC).

## III.

## FINDINGS OF FACT

14. "When default is entered due to defendant's failure to answer, the substantive allegations raised by plaintiff's complaint are no longer in issue, and for the purposes of entry of default and default judgment are deemed admitted." *Bell v. Martin*, 299 N.C. 715, 721, 264 S.E.2d 101, 105 (1980). Thus, for purposes of default

judgment against AccuKing and TriTech, the allegations in Plaintiff's Complaint are deemed admitted. Those facts are as follows:

15. TriTech is a North Carolina corporation with its principal office in Durham County, North Carolina. (Compl. ¶ 4, ECF No. 3.) TriTech was incorporated on April 11, 2006 by King, who served as the self-identified CEO of the business. (Compl. ¶ 9.)

16. AccuKing is a North Carolina corporation with its principal office located in Craven County, North Carolina. (Compl. ¶ 3.) King's wife, Ingrid King, founded AccuKing on March 26, 2014, although the company was initially named King Aerospace and Technologies Corporation before it changed its name, first to King AeroTech, Inc. and later to AccuKing.[2] (Compl. ¶¶ 18–19.)

17. King is an individual residing in Craven County, North Carolina. (Compl. ¶ 2.)

18. Pee Dee is a North Carolina non-profit electric cooperative with its principal office in Anson County, North Carolina. (Compl. ¶ 1.) Pee Dee "is engaged in the business of distributing retail electric energy to members" throughout several North Carolina counties. (Compl. ¶ 8.)

19. On or about November 28, 2012, TriTech sent Pee Dee an invoice for software licenses and support services created and provided by a third party, VMware. (Compl. ¶ 10; Compl. Ex. A, ECF No. 6.) TriTech offered to purchase and secure the identified licenses and support services from VMware for Pee Dee. (Compl.

---

[2] For convenience, the Court refers to AccuKing and its former iterations as "AccuKing."

¶¶ 10–11.)  Pee Dee paid TriTech $31,266.91 for VMware's licenses and support services.  (Compl. ¶ 13.)

20.    Following the incorporation of AccuKing, King ceased providing technology and consulting services through TriTech and transferred the company's business relationships to AccuKing.  (Compl. ¶ 20.)  As a result, on or about September 24, 2014, Pee Dee received an invoice from AccuKing offering to purchase software license renewals on Pee Dee's behalf.  (Compl. ¶ 21.)  The license renewals would allow Pee Dee to use VMware software from March 20, 2013 through September 19, 2015 and would cost Pee Dee $22,495.30.  (Compl. ¶ 21.)  On October 7, 2014, Pee Dee paid AccuKing the full amount requested by the September 24, 2014 invoice.  (Compl. ¶ 24.)

21.    Roughly a year later, in August 2015, AccuKing again invoiced Pee Dee for support subscriptions and license renewals for VMware products.  (Compl. ¶ 29.)  On this occasion, Pee Dee paid AccuKing $42,860.85 for the VMware license renewals and support subscriptions.  (Compl. ¶ 32.)

22.    In May 2016, Pee Dee discovered the truth about TriTech's and AccuKing's services.  When Pee Dee's director of information technology, Janet Carson ("Carson"), contacted VMware for software support, VMware informed her that the licenses it had on file for Pee Dee had expired in 2012.  (Compl. ¶¶ 39–40.)  The licenses on file were also for Version 4.0 of VMware's software.  (Compl. ¶ 40.)  TriTech had initially invoiced Pee Dee for Version 5.0 licenses.  (Comp. ¶ 10.)  Pee Dee was currently using Version 5.5 or Version 6.0.  (Compl. ¶ 38.)  With VMware's

assistance, Pee Dee learned that the licenses for the software installed on Pee Dee's systems were actually registered to a neighboring electric cooperative and linked with that cooperative's contract number. (Compl. ¶¶ 42, 48.)

23. In truth, TriTech and AccuKing never purchased licenses and support services for Pee Dee. (Compl. ¶¶ 14, 25, 33.) Instead, TriTech, and then AccuKing, had installed and run VMware software on Pee Dee's systems through the unauthorized use of the neighboring cooperative's licenses with VMware. (Compl. ¶¶ 15, 26, 34.) Pee Dee was unaware of this unauthorized practice because it had been using King, TriTech, and AccuKing as its contracted conduit for communications with VMware. (Compl. ¶¶ 15, 27, 35.)

24. On June 21, 2016, Carson emailed King to inquire about the information VMware had provided to Pee Dee. (Compl. ¶ 44.) King did not respond. (Compl. ¶ 44.)

25. On June 23, 2016, Pee Dee's CEO, Donnie Spivey ("Spivey"), also emailed King for clarification about the licensing issue. (Compl. Ex. H, ECF No. 6.) King did not respond to Spivey's email. (Compl. ¶ 45.) Over the next two months, Carson continued to email King about the problem. (Compl. ¶¶ 46–47.) King did not reply to any of these emails. (Compl. ¶¶ 46–47.)

26. Sometime later, on September 26, 2016, King responded to a subsequent email from Spivey. (Compl. ¶ 50.) King claimed that Pee Dee had not communicated with him previously about Pee Dee's licensing issues. (Compl. ¶ 50.) King also stated that Pee Dee's licenses had been purchased through VMware's parent corporation,

Dell, and that King had contacted Dell and had been assured the issue would be resolved. (Compl. ¶ 50.) Over the next several months, King continued to represent to Pee Dee that he was speaking with Dell and that the matter would be resolved shortly. (Compl. ¶¶ 52–57.) None of these representations were true. (Compl. ¶¶ 57, 67–68.)

27. Spivey emailed King on November 9, 2016 to request a resolution of the licensing issue or a refund of Pee Dee's money. (Compl. ¶ 58.) King responded by again indicating that he was working with Dell to remedy the problem. (Compl. ¶ 59.)

28. A week later, on November 16, 2016, Carson emailed King and requested his Dell customer number, the Dell order number for the license purchases, the name of the Dell representative with whom King had spoken, and the purchase ID number of the order King represented that he had placed with Dell. (Compl. ¶ 60.) King responded to Carson's email on November 17, 2016 and stated that "there was nothing to track" at that time until a process "on the backend" was complete. (Compl. ¶ 61; Compl. Ex. M, at 1, ECF No. 6.) At the hearing, Carson testified that this representation was unusual based on her experience in the technology industry.

29. Following his response to Carson's November 16, 2016 email, King ceased all communications with Pee Dee. (Compl. ¶¶ 61–63.)

30. For the purposes of entering default judgment against TriTech and AccuKing, the Court further FINDS as follows:

31.     In total, Pee Dee paid TriTech ($31,266.91) and AccuKing ($65,356.15) a combined sum of $96,623.06 for software licenses and support subscriptions that TriTech and AccuKing never purchased or provided to Pee Dee.

32.     Pee Dee's payments to TriTech and AccuKing, and the losses suffered as a result of those payments, were proximately caused by TriTech's and AccuKing's conduct.

33.     Plaintiff has provided proof, via affidavits and filings with the North Carolina Department of the Secretary of State, that AccuKing and TriTech are incorporated in this State, conducted substantial business within this State, and promised to provide goods and services within this State. (Christensen Aff. Exs. 2, 3, ECF No. 15.1; Spivey Aff. ¶¶ 5–7, ECF No. 15.2; Carson Aff. ¶¶ 2–5, ECF No. 15.3.)

IV.

CONCLUSIONS OF LAW

34.     Plaintiff has provided proof of personal jurisdiction over TriTech and AccuKing pursuant to N.C. Gen. Stat. § 1-75.11(1).

35.     Although a defaulting defendant is deemed to have admitted the allegations in a plaintiff's complaint, for the Court to enter default judgment, that complaint must state a cause of action. *Brown v. Cavit Scis., Inc.*, 230 N.C. App. 460, 467, 749 S.E.2d 904, 909 (2013) ("A complaint which fails to state a cause of action is not sufficient to support a default judgment for plaintiff."). "In determining whether the allegations are sufficient to state a claim for relief . . . every reasonable intendment and presumption must be made in favor of the pleader." *Id.* (internal quotation marks

omitted).  If "any portion of the complaint . . . presents facts sufficient to constitute a cause of action, or if facts sufficient for that purpose fairly can be gathered from it, the pleading will stand[.]"  *Id.* (quoting *Presnell v. Beshears*, 227 N.C. 279, 281, 41 S.E.2d 835, 837 (1947)).

A.    Breach of Contract

36.    The Court first addresses Plaintiff's claim for breach of contract.

37.    "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract."  *Supplee v. Miller-Motte Bus. Coll., Inc.*, 239 N.C. App. 208, 216, 768 S.E.2d 582, 590 (2015).  "The well-settled elements of a valid contract are offer, acceptance, consideration, and mutuality of assent to the contract's essential terms."  *Se. Caissons, LLC v. Choate Constr. Co.*, 784 S.E.2d 650, 654 (N.C. Ct. App. 2016).  A valid contract may be implied in fact where the actions of the parties show an implied offer and acceptance.  *Creech v. Melnik*, 347 N.C. 520, 526–27, 495 S.E.2d 907, 911–12 (1998).  A party may accept by performing an act, such as making a payment.  *See Hardy v. Ward*, 150 N.C. 385, 392, 64 S.E. 171, 174 (1909); *Koppers Co. v. Kaiser Aluminum & Chem. Corp.*, 9 N.C. App. 118, 126, 175 S.E.2d 761, 767 (1970).

38.    Here, valid contracts existed between Plaintiff and TriTech and Plaintiff and AccuKing.  The invoices sent to Plaintiff by TriTech and AccuKing offered to purchase VMware software licenses and support subscriptions—or subsequently, renewals of those licenses and services—for Plaintiff.  (Compl. Exs. A, C, E, ECF No. 6.)  TriTech and AccuKing are deemed to have admitted that each invoice was an

offer to act as Pee Dee's "agent with respect to the purchase and securing of the identified licenses" or license renewals. (Compl. ¶¶ 11, 22, 30.) Plaintiff paid the amount requested by each invoice, thereby accepting TriTech's and AccuKing's offers. (Compl. Exs. B, D, F, ECF No. 6.) A valid contract was formed between the parties upon Plaintiff's payment of each invoice. *See Koppers Co.*, 9 N.C. App. at 126, 175 S.E.2d at 767. TriTech and AccuKing breached those contracts by failing to purchase the licenses and support subscriptions as promised. Plaintiff's Complaint thus states a claim for breach of contract against TriTech and AccuKing. Consequently, the Court will grant Plaintiff's Motion as to Plaintiff's claim for breach of contract. On the facts deemed admitted and as established by the evidence introduced at the hearing, the Court finds that Plaintiff is entitled to $96,623.06 in compensatory damages on this claim.

B. Fraud

39. The Court next turns to Plaintiff's claim for fraud against TriTech and AccuKing.

40. The elements "of actionable fraud are well established: (1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974). "Normally, a promissory misrepresentation will not support an allegation of fraud." *Leake v. Sunbelt, Ltd. of Raleigh*, 93 N.C. App. 199, 204, 377 S.E.2d 285, 288–89 (1989). A complaint may, however, state a claim for fraud based on promissory

representations if it alleges facts from which the fact finder "may reasonably infer that the defendant did not intend to carry out such representations when they were made." *Whitley v. O'Neal*, 5 N.C. App. 136, 139, 168 S.E.2d 6, 8 (1969).

41. A plaintiff must plead all of the material facts and circumstances constituting fraud with particularity. N.C. R. Civ. P. 9(b); *Moore v. Wachovia Bank & Tr. Co.*, 30 N.C. App. 390, 391, 226 S.E.2d 833, 834–35 (1976). This particularity requirement "generally encompasses the time, place and contents of the fraudulent representation, the identity of the person making the representation and what was obtained by the fraudulent acts or representations." *Terry v. Terry*, 302 N.C. 77, 85, 273 S.E.2d 674, 678 (1981). There is, however, no specific formula for pleading fraud, and a complaint will sufficiently state a claim for fraud when "upon a liberal construction of the whole pleading, the charge of fraud might be supported by proof of the alleged constitutive facts." *Piles v. Allstate Ins. Co.*, 187 N.C. App. 399, 406, 653 S.E.2d 181, 186 (2007).

42. With regard to Plaintiff's claim for fraud, in addition to the facts outlined above, Plaintiff further alleges as follows:

    a. "King intentionally, knowingly, and maliciously used [TriTech and AccuKing] as vehicles and conduits for defrauding [Plaintiff] of at least $96,623.06." (Compl. ¶ 66.)

    b. "Defendants knowingly and with fraudulent intent made false representations concerning their acquisition of licenses for [Plaintiff] in exchange for monies paid by [Plaintiff] to Defendants." (Compl. ¶ 67.)

c. "Defendants knowingly and with fraudulent intent made false representations concerning their efforts to resolve licensing issues on [Plaintiff's] behalf." (Compl. ¶ 68.)

d. "Defendants knowingly and with fraudulent intent concealed material facts concerning the absence of software licenses and their unauthorized use of another company's licenses on [Plaintiff's] computers." (Compl. ¶ 69.)

e. "[Plaintiff] discovered the fraud on September 20, 2016." (Compl. ¶ 70.)

f. "Defendants' representations or concealments were reasonably calculated to deceive [Plaintiff]." (Compl. ¶ 71.)

g. "Defendants intended to deceive [Plaintiff]." (Compl. ¶ 72.)

h. "[Plaintiff] reasonably relied on Defendants' statements and assurances." (Compl. ¶ 73.)

i. "[Plaintiff] was in fact deceived by Defendants." (Compl. ¶ 74.)

43. Plaintiff has particularly alleged that King, then doing business via AccuKing, made multiple representations to Plaintiff in an effort to conceal or explain away the installation of unauthorized software on Plaintiff's systems, including representations indicating that TriTech and AccuKing had, in fact, purchased the promised VMware licenses. (Compl. ¶¶ 38, 50, 52, 54, 57, 61.) None of these representations were true, and TriTech and AccuKing are deemed to have admitted the same upon their default. Plaintiff has also alleged that first TriTech and then AccuKing billed Plaintiff for software licenses and support subscriptions that were

never purchased on Plaintiff's behalf. (Compl. ¶¶ 14, 25, 33.) Plaintiff has alleged numerous facts from which a reasonable inference can be drawn that TriTech and AccuKing never intended to perform as promised. For example, although TriTech never purchased the software or support services for Plaintiff after the first invoice, AccuKing continued to bill Plaintiff for further renewals—renewals of licenses AccuKing knew Plaintiff did not have.

44. The Court, having reviewed the above allegations and the remainder of the Complaint, concludes Plaintiff's Complaint alleges the elements of a claim for fraud with sufficient particularity. The Court therefore concludes that Plaintiff's Complaint states a claim for fraud and will grant Plaintiff's Motion as to that claim.

45. On the facts deemed admitted and as established by the evidence introduced at the hearing, the Court finds that Plaintiff is entitled to recover $96,623.06 in compensatory damages on its claim for fraud. Because Plaintiff's entitlement to this compensation stems from the same wrong as Plaintiff's claim for breach of contract, this amount will not be awarded duplicatively. *See Bruton v. Carolina Power & Light Co.*, 217 N.C. 1, 7, 6 S.E.2d 822, 826 (1940) ("Plaintiff recovers one compensation for all loss and damage, past and prospective, which were the certain and proximate results of the single wrong or breach of duty.").

C. Unfair or Deceptive Trade Practices Under N.C. Gen. Stat. § 75-1.1

46. The final claim addressed is Plaintiff's claim for unfair or deceptive trade practices.

47. A private cause of action under North Carolina's Unfair and Deceptive Trade Practices Act is stated when a plaintiff alleges "(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." *Brinkman v. Barrett Kays & Assocs., P.A.*, 155 N.C. App. 738, 743, 575 S.E.2d 40, 44 (2003). Whether an act found by the fact finder to have occurred is an unfair or deceptive practice in violation of N.C. Gen. Stat. § 75-1.1 is a question of law. *Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 71, 653 S.E.2d 393, 399 (2007). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Id.* at 72, 653 S.E.2d at 399. "A practice is deceptive if it has the capacity or tendency to deceive." *Id.*

48. A wide variety of conduct may give rise to a claim for unfair or deceptive trade practices. *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 88, 747 S.E.2d 220, 226 (2013) (noting that section 75-1.1 "covers more than traditional common law proscriptions on tortious conduct, though fraud and deceit tend to be included within its ambit"). Fraud necessarily constitutes an unfair or deceptive act. *Hardy v. Toler*, 288 N.C. 303, 309, 218 S.E.2d 342, 346 (1975). In contrast, a breach of contract will only serve as the basis for an unfair or deceptive trade practices claim when a plaintiff shows that "substantial aggravating circumstances" accompanied the breach. *Branch Banking & Tr. Co. v. Thompson*, 107 N.C. App. 53, 62, 418 S.E.2d 694, 700 (1992). Deception in the formation of a contract is "[a] classic example of an

aggravating circumstance." *Post v. Avita Drugs, LLC*, 2017 NCBC LEXIS 95, at *10 (N.C. Super. Ct. Oct. 11, 2017); *see Custom Molders, Inc. v. Roper Corp.*, 101 N.C. App. 606, 614, 401 S.E.2d 96, 100, *aff'd per curiam*, 330 N.C. 191, 410 S.E.2d 55 (1991). Such deception is present when a defendant induces a plaintiff to enter a contract while having no intention of keeping the promises made. *Custom Molders, Inc.*, 101 N.C. App. at 614, 401 S.E.2d at 100.

49. Plaintiff has alleged facts in this case which constitute both a breach of contract accompanied by aggravating circumstances and fraud. These facts are deemed admitted. The Court therefore concludes that TriTech's and AccuKing's alleged conduct was unfair and deceptive and was in or affecting commerce. Plaintiff has proven such conduct was a proximate cause of Plaintiff's damages. Accordingly, the Court will grant Plaintiff's Motion as to Plaintiff's claim for unfair or deceptive trade practices.

50. On the facts deemed admitted and as established by the evidence introduced at the hearing, the Court finds that Plaintiff is entitled to $96,623.06 in compensatory damages on its claim for unfair or deceptive trade practices under section 75-1.1. Because Plaintiff's entitlement to this compensation stems from the same wrong as Plaintiff's claims for breach of contract and fraud, this amount will not be awarded duplicatively. *See Bruton*, 217 N.C. at 7, 6 S.E.2d at 826.

D. Underline AccuKing is a Mere Continuation of TriTech

51. The final issue for the Court's determination is whether AccuKing and TriTech are jointly and severally liable for Plaintiff's total damages. Plaintiff

contends that they should be, alleging in its Complaint that AccuKing "is a mere continuation of TriTech[.]" (Compl. ¶ 20.)

52. Generally, North Carolina law respects the separateness of different corporate entities, and the purchase of all, or substantially all, of the assets of one corporation does not make another liable for the first's debts or liabilities. *Budd Tire Corp. v. Pierce Tire Co.*, 90 N.C. App. 684, 687, 370 S.E.2d 267, 269 (1988). An exception to this rule applies when the acquiring corporation is a "mere continuation" of the selling corporation. *L.J. Best Furniture Distribs., Inc. v. Capital Delivery Serv., Inc.*, 111 N.C. App. 405, 408, 432 S.E.2d 437, 440 (1993). "The traditional rule regarding mere continuation is that a corporate successor is the continuation of its predecessor if only one corporation remains after the transfer of assets and there is identity of stockholders and directors between the two corporations." *G.P. Publ'ns, Inc. v. Quebecor Printing - St. Paul, Inc.*, 125 N.C. App. 424, 434, 481 S.E.2d 674, 680 (1997) (internal quotation marks omitted).

53. While the traditional mere continuation rule emphasizes "continuity of stockholders and directors" between two corporations, "a purchaser conceivably could be found to be the corporate successor of the selling corporation even though there is no continuity of ownership." *Id.* at 434–35, 481 S.E.2d at 680. North Carolina thus considers three factors in determining whether one corporation is a mere continuation of another: (1) continuity of ownership, (2) inadequacy of consideration for acquired assets, and (3) some lack of the "elements of a good faith purchaser for

value" in the circumstances surrounding the transaction. *Id.* at 434–35, 439, 481 S.E.2d at 680, 683.

54. The Court of Appeals' decision in *L.J. Best Furniture Distributors, Inc.* provides a helpful example for the application of the mere continuation rule. In that case, a plaintiff sued two corporations—Capital Delivery Service, Inc. ("Capital") and Duncan Transportation, Inc. ("Duncan")—alleging that Duncan was also liable for damages plaintiff suffered while contracting with Capital. *L.J. Best Furniture Distribs., Inc.*, 111 N.C. App. at 406–07, 432 S.E.2d at 439. The undisputed facts of the case showed that Capital, which was owned in part by Jerry Duncan, contracted with the plaintiff and subsequently ceased to operate. *Id.* Very soon thereafter, Jerry Duncan's wife incorporated Duncan and became a shareholder in the second corporation with two other individuals. *Id.* Additional evidence showed that Duncan began leasing the trucks previously leased to Capital (with replaced logos), that Duncan served the same customers that Capital had previously serviced, that Duncan may have acquired Capital's good will, and that the employees of Capital became employees, officers, or shareholders of Duncan. *Id.* at 409, 432 S.E.2d at 440. There was no evidence that Duncan ever paid Capital consideration for these or other assets. *Id.* The court held that this evidence raised a question of fact as to whether Duncan was a mere continuation of Capital such that summary judgment on the issue was inappropriate. *Id.* at 409–10, 432 S.E.2d at 441.

55. In the absence of evidence of continuity of ownership, this Court has previously declined to extend mere continuation liability beyond the "narrowly

circumscribed factual circumstances giving rise to the [Court of Appeals'] decision in *L.J. Best Furniture*—i.e., intra-family, de facto transfer of assets absent a 'formal purchase,' without sufficient consideration." *Lattimore & Assocs., LLC v. Steaksauce, Inc.*, 2012 NCBC LEXIS 34, at \*20 (N.C. Super. Ct. May 25, 2012). Here, however, Plaintiff's Complaint alleges—and TriTech and AccuKing are deemed to admit—the existence of such narrow circumstances.

56. Relevant to Plaintiff's assertion that the mere continuation rule applies to TriTech and AccuKing, Plaintiff has alleged that King incorporated TriTech in 2006, after which TriTech entered into the first agreement with Plaintiff to purchase the software licenses and support subscriptions. Plaintiff further alleges:

a. "On March 26, 2014, Ingrid Y. King, spouse of Defendant Bryan J. King . . . founded [AccuKing]." (Compl. ¶ 18.)

b. "Bryan J. King ceased providing consulting and technology services through [TriTech] and transferred the company's business relationships to [AccuKing], such that [AccuKing] absorbed and continued the operation of TriTech, there was a *de facto* merger between the two corporations and/or [AccuKing] is a mere continuation of [TriTech]." (Compl. ¶ 20.)

57. The alleged facts show that AccuKing served as Plaintiff's agent with regard to the acquisition of VMware software and support subscriptions, just as TriTech had. Nothing suggests that AccuKing paid TriTech any consideration for TriTech's business or assets. In short, the facts deemed admitted here show an "intra-family,

de facto transfer of assets absent a 'formal purchase,' without sufficient consideration." *Lattimore & Assocs., LLC*, 2012 NCBC LEXIS 34, at *20. The Court thus concludes that Plaintiff has sufficiently pleaded that AccuKing is a mere continuation of TriTech and enters judgment against both corporations accordingly.

E.   Plaintiff's Election of Remedies

58.   Plaintiff's Motion asks the Court to award Plaintiff treble damages and additionally "requests an opportunity to prove at a non-jury motion hearing before this Court that a further award of punitive damages . . . is appropriate and warranted." (Pl.'s Mem. Law Supp. Mot. Default J. 6, ECF No. 15.)

59.   "[A] party may not recover punitive damages for tortious conduct and treble damages for a violation of Chapter 75 based on that same conduct." *United Labs., Inc. v. Kuykendall*, 335 N.C. 183, 191, 437 S.E.2d 374, 379 (1993). A plaintiff must elect between recovering punitive damages or treble damages. *Ellis v. N. Star Co.*, 326 N.C. 219, 227, 388 S.E.2d 127, 132 (1990).

60.   After the conclusion of testimony at the evidentiary hearing, Plaintiff moved the Court for entry of judgment in the amount of Plaintiff's actual damages and asked that the Court treble that amount. The Court thus understands that Plaintiff has abandoned its request for punitive damages and is electing to pursue treble damages under Chapter 75.[3] Having concluded such relief is appropriate, the Court will treble Plaintiff's actual damages.

---

[3] Further, in the event the Court has misunderstood Plaintiff's request, Plaintiff will not be prejudiced by the Court's conclusion, as the additional recovery the Court has determined Plaintiff is entitled to under N.C. Gen. Stat. § 75-16 exceeds the amount of punitive damages the Court, in its discretion, considers appropriate in this case. *Nguyen v. Taylor*, 219 N.C.

V.

CONCLUSION

61. **WHEREFORE**, for the reasons set forth herein, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that Plaintiff's Motion is **GRANTED in part and DENIED in part** as to Defendants TriTech and AccuKing and that the Court **ENTERS JUDGMENT** against Defendants TriTech and AccuKing as follows:

a. Plaintiff's actual damages of $96,623.06 shall be trebled pursuant to N.C. Gen. Stat. § 75-16, and Plaintiff shall have and recover against TriTech and AccuKing, jointly and severally, the total amount of $289,869.18, plus interest on said amount as provided by law.

b. Plaintiff's request for attorneys' fees is **DENIED**.

**SO ORDERED**, this the 15th day of March, 2018.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Special Superior Court Judge
 for Complex Business Cases

---

App. 1, 14, 723 S.E.2d 551, 561 (2012) (reviewing the amount of punitive damages a trial court awarded for abuse of discretion).